**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

STEPHEN W. MCKNIGHT,　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　　　　Plaintiff　　　:　　CIVIL ACTION NO. 4:10-CV-02126
　　　　　　　　　　　　　　　　　:
　　　　　　vs.　　　　　　　　　:　　**(Complaint Filed 10/14/10)**
　　　　　　　　　　　　　　　　　:
MICHAEL ASTRUE,　　　　　　　　 :
COMMISSIONER OF SOCIAL　　　　　:　　　　**(Judge Caputo)**
SOCIAL SECURITY,　　　　　　　　 :
　　　　　　　　　　　　　　　　　:
　　　　　　　　　Defendant　　　:


**MEMORANDUM AND ORDER**


**BACKGROUND**

　　　　　　The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Stephen W. McKnight's claim for social security disability insurance benefits. For the reasons set forth below we will remand the case to the Commissioner for further proceedings.

　　　　　　Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that McKnight met the insured status requirements of the Social Security Act through December 31, 2008. Tr. 12, 14, and 193.[1] In order to establish entitlement to disability insurance benefits McKnight was required to establish that he suffered from a disability on or before that date. 42 U.S.C. §

_____

　　　　[1]References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on December 28, 2010.

423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

McKnight was born on August 21, 1961. Tr. 74, 183 and 192.  McKnight graduated from high school and can read, write, speak and understand the English language. Tr. 29-30, 196 and 206.  After high school, McKnight completed two years of college and obtained an Associate Degree in automobile mechanics.  Tr. 29-30 and 206. He also obtained a certificate in automobile mechanics from General Motors in 1983. Id. McKnight has past relevant employment[2] as an automobile mechanic which is classified as skilled, medium work.[3]  Tr. 18, 30 and 198.

---

[2]Past relevant employment in the present case means work performed by McKnight during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

[3]The terms sedentary, light, medium and heavy work are defined in the Social Security regulations as follows:

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work,  you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(continued...)

McKnight maintained consistent employment from 1978 through 2003, a total of 26 years. Tr. 187. He also worked for approximately 6 weeks in 2004. Id. Except for the years 1978, 1992, and 2004, in each of those years he accumulated four quarters of earnings for purposes of social security benefits. Id. In 1978 and 1992 he only accumulated three quarters and in 2004 none. Id. Records of the Social Security Administration reveal that McKnight had earnings from 1978 through 2004 as follows:

| | |
|---|---|
| 1978 | $    830.68 |
| 1979 | 2413.68 |
| 1980 | 7373.45 |
| 1981 | 1335.00 |
| 1982 | 2368.26 |
| 1983 | 5382.25 |
| 1984 | 4875.00 |
| 1985 | 12612.03 |
| 1986 | 12595.35 |
| 1987 | 13813.34 |
| 1988 | 14569.99 |
| 1989 | 16116.15 |
| 1990 | 19989.52 |
| 1991 | 18299.98 |
| 1992 | 1848.00 |
| 1993 | 8686.35 |
| 1994 | 18433.80 |

---

[3](...continued)

(c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567.

| | |
|---|---|
| 1995 | 19296.16 |
| 1996 | 19659.84 |
| 1997 | 25285.89 |
| 1998 | 26728.17 |
| 1999 | 7243.86 |
| 2000 | 28249.19 |
| 2001 | 24951.74 |
| 2002 | 24500.90 |
| 2003 | 20552.52 |
| 2004 | 645.12 |

Id.  McKnight's total earnings from 1978 through 2004 were $358,756.22. Id.

McKnight contends that in October, 2003, he sustained a neck injury while working under a motor vehicle with his arms above his head. Tr. 513.  The exact mechanism of the initial injury to McKnight's neck is not clear.   It appears that he was  "torqueing a nut" and had "an acute onset of neck, left arm and chest discomfort in the pectoral region." Tr. 446.   After the injury, he had cardiac testing and an MRI of the cervical spine.  Tr. 255-258 and 575-583.  The cardiac testing revealed McKnight's chest pain was of a "nonischemic nature." Tr. 256.  The MRI revealed "[m]oderate to severe disc space narrowing with most likely degenerative disc disease associated with broad based C6/7 disc herniation." Tr. 255.  McKnight was treated by a family physician and a chiropractor and eventually went back to work in early April, 2004, on a part-time basis. Tr. 31-32, 373-374 and 480-481.   However, that employment only lasted until May 17, 2004, when he "reinjured himself. " Id.  McKnight has not worked since that date. Id.   McKnight alleges that he is disabled as the result of a history of cervical surgery, neck pain, chest pain, numbness in his entire back and into his extremities,  sciatica, right leg pain, low back pain and spasms, and acid reflux. Tr.  29 and 197.  McKnight claims that he has constant pain in his neck and lower back. Id.

On November 9, 2007, McKnight filed protectively[4] an application for disability insurance benefits. Tr. 12, 74 and 183-185.  On March 13, 2008, the Bureau of Disability Determination[5] denied McKnight's application. Tr.  74-80.  On May 15, 2008, McKnight requested a hearing before an administrative law judge. Tr. 81.   After 20 months had passed, a hearing before an administrative law judge was held on January 12, 2010.  Tr. 25-73.  On January 27, 2010, the administrative law judge issued a decision denying McKnight's application. Tr. 12-20.  On March 29, 2010, McKnight  requested that the Appeals Council review the administrative law judge's decision and on August  20, 2010, the Appeals Council concluded that there was no basis upon which to grant McKnight's request for review. Tr. 2-6 and 118.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On October 14, 2010, McKnight filed a complaint in this court requesting that we reverse the decision of the Commissioner denying him social security disability insurance benefits.   The Commissioner filed an answer to the complaint and a copy of the administrative record on December 28, 2010.  On February 3, 2011, McKnight filed his brief and on March 8, 2011, the Commissioner filed his brief.  The appeal[6] became ripe for

---

[4]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[5]The Bureau of Disability Determination is a state agency which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 77.

[6]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

disposition on March 25, 2011, when McKnight elected not to file a reply brief.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.");  Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of

evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the record. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the claimant is represented by counsel."); Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000);  see also Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]").  If the record

is not adequately developed, remand for further proceedings is appropriate.  Id.

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[7] (2) has an impairment that is severe

---

[7]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

or a combination of impairments that is severe,[8] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[9] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[10]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must

---

[8] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

[9] If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

[10] If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

include a discussion of the individual's abilities.  Id; 20 C.F.R. § 404.1545; Hartranft, 181

F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still

able to do despite the limitations caused by his or her impairment(s).").

## MEDICAL RECORDS

Before we address the administrative law judge's decision and the errors

committed by him, we will review in detail McKnight's medical records.  The medical records

reveal that McKnight received treatment for, *inter alia*,  problems with his neck and lower

back, anxiety, and gastroesophageal reflux disease (GERD).  McKnight had multiple periods

of physical therapy, chiropractic treatment and acupuncture treatment for his neck and back

pain.

The alleged disability onset date in this case is October 17, 2003, and we will

commence by considering a medical record dated October 15, 2003, the earliest medical

record contained within the administrative record. Tr. 484.  On that date McKnight had an

appointment  with  James  L.  Wilson,  M.D.,  Section  of  Family  Practice,  Guthrie  Clinic,

Wellsboro, Pennsylvania. Id.   At  that  appointment  McKnight  complained  of  "GERD

symptoms." Id. Dr. Wilson's assessment was that McKnight suffered from gastroesophageal

reflux disease and prescribed the drug Protonix.[11]  Id.

As previously mentioned McKnight alleges that on October 17, 2003, he injured

his neck at work.  On that date McKnight visited the emergency department at Soldiers &

---

[11]"Protonix is in a group of drugs called proton pump inhibitors. It decreases the
amount of acid produced in the stomach. Protonix is used to treat erosive esophagitis
(damage to the esophagus from stomach acid), and other conditions involving excess
stomach acid[.]" Protonix, Drugs.com, http://www.drugs.com/protonix.html (Last accessed
October 12, 2011).

Sailors Memorial Hospital, Wellsboro. Tr. 579-583.  The medical records regarding this visit contained within the administrative record are rather limited and difficult to interpret because of their poor quality. Id.   It appears that at this visit McKnight complained of chest pain/tightness and radiation of pain to his left arm. Tr. 579. He also complained of dizziness, nausea, and sweating. Id.  Several diagnostic tests were ordered by the attending physician, including a complete blood count and chemistry, an EKG, and a chest x-ray.[12] Tr. 580-582. The chest x-ray was normal. Id.  The blood count and chemistry were normal. Id.  The EKG revealed a normal sinus rhythm. Id.  The impression of the treating medical provider was that McKnight was suffering from chest pain and gastroesophageal reflux disease. Id.  It appears that certain medications[13] were prescribed and McKnight was discharged from the emergency department in a stable condition.  Tr. 580.

On October 20, 2003, McKnight again visited the emergency department at Soldiers & Sailors Memorial Hospital with similar symptoms. Tr. 575-576.  He complained of chest pain and tingling in his left arm. Id.  Blood work was normal. Id.   A chest x-ray and EKG were normal.  Tr. 577-578.  The clinical impression was that McKnight was suffering

---

[12]McKnight may have had a stress test performed on October 18, 2003, because the medical record appears to indicate "treadmill tomorrow." Tr. 580.  The medical record is of extremely poor quality.

[13]Because of the poor quality of the medical record we cannot tell what medications were prescribed.

from acute chest pain, costochondritis,[14] bronchitis and pleurisy.[15] Tr. 576.  We can discern that he was discharged to home on the same day. Id.  However, because the record is illegible we cannot discern his condition at the time of discharge.  Id.

On October 23, 2003, McKnight had an appointment with Dr. Wilson at the Guthrie Clinic. Tr. 483. The record of that appointment states in toto as follows: "SUBJECTIVE: Comes in and has been to the hospital a couple of times for checkups. Has had a stress test. Had some abnormal chest pain that has really got him spooked. His father went thru this some years ago. Therefore, I am going to refer him to cardiology for further evaluation. OBJECTIVE: Today his B/P 130/80. Chest clear. Heart - NSR.[16] ASSESSMENT/PLAN: Doubt cardiac problem, but must check to be sure." Id.

On October 27, 2003, McKnight had cardiac stress testing at Geisinger Medical Center, Danville, Pennsylvania, by Ashok Shah, M.D.  Tr. 256-257.   The report of that testing states in relevant part as follows: "The patient exercised for 8 minutes and 10 seconds and stopped at 2 minutes and 10 seconds of stage III of Bruce protocol because of fatigue.  At peak exercise he had a maximum heart rate of 179 beats per minute which was 100% of his maximum predicted heart rate for his age. His maximum blood pressure

---

[14]Costochondritis "is an inflamation of the cartilage that connects a rib to the breastbone. . . Pain caused by costochondritis may mimic that of a heart attack or other heart conditions." Costochondritis, Definition, Mayo Clinic staff, http://www.mayoclinic. com/health/costochondritis/DS00626 (Last accessed October 18, 2011).

[15]"Pleurisy occurs when the double membrane (pleura) that lines the inside of you chest cavity and surrounds each of your lungs becomes inflamed.  Also called pleuritis, pleurisy typically causes sharp pain, almost always when you are inhaling and exhaling." Pleurisy, Definition, Mayo Clinic staff, http://www.mayoclinic.com/health/pleurisy/DS00244 (Last accessed October 18, 2011).

[16]"NSR" is an abbreviation for normal sinus rhythm.

was 170/90. Maximum workload was 10.2 METS.[17]   No diagnostic electrocardiogram changes to suggest ischemia were noted." Id.   Also, on October 27, 2003, at Geisinger Medical Center McKnight had an MRI of the cervical spine which revealed a "broad based C6/7 disc herniation." Tr. 255.

After the report of the October 27th  MRI, other than two one-page radiology reports dated October 31, 2003, and January 14, 2004, there are no medical records contained within the administrative record until a record dated March 8, 2004.  Tr. 373-374 and 482.   The radiology reports were prepared by a chiropractic physician. Subsequent records  reveals that the chiropractor was a Lawrence Bellows, D.C.  Tr. 266 and 377.  Our review of the administrative record did not reveal any of Dr. Bellow's treatment records.  The radiology report dated October 31, 2003, reveals that McKnight suffered from cervical curvature loss;  cervical spondylosis[18] at the C6 level; encroachment of the neuroforamina

_____

[17]"MET or the standard metabolic equivalent is a unit used to estimate the amount of oxygen used by the body during physical activity. . . . Activity that burns > 6 METs is considered vigorous-intensity physical activity."  MET – The standard metabolic equivalent, About.com, http://sportsmedicine.about.com/od/glossary/g/MET.htm (Last accessed October 19, 2011).

[18]According to the Mayo Clinic website

> Cervical spondylosis is a general term for age-related wear and tear affecting the disks in your neck. These changes later contribute to the development of cervical osteoarthritis in the joints that link your neck bones (facet joints).
>
> *       *       *       *       *       *       *       *       *       *       *
>
> As you age, the bones and cartilage that make up your backbone and neck gradually deteriorate, sometimes forming irregular bony outgrowths called bone spurs. These changes, which are characteristic of cervical spondylosis, occur in everyone's spine.

(continued...)

between C6-C7;[19] vertebral subluxation[20] at levels C3, C4, C5, C6 and C7; lateral lumbar curvature loss; vertebral subluxation at level L1-5; and compression at levels C6 and C7. Tr. 374.  The radiology report dated  January 14, 2004, set forth similar findings with respect to McKnight's cervical spine. Tr. 373.

On March 8, 2004, McKnight had an appointment with David A. Pfisterer, M.D., Section of Family Practice, Guthrie Clinic, Wellsboro. Tr. 482.  At that appointment McKnight had a "host of complaints." Id.  McKnight complained of neck problems, tingling in his right shin and sweating in his hands and feet. Id.  McKnight "expressed concern that he developed shingles on his right leg[.]" Id.  McKnight told Dr. Pfisterer that he took a Lorazepam[21] and "his symptoms all got better." Id.  Dr. Pfisterer's assessment/plan was as

---

[18](...continued)
        *       *       *       *       *       *       *       *       *       *       *

        In a small percentage of cases,  cervical spondylosis may compress one or
        more of the spinal nerves −  a condition called cervical radiculopathy. Bone
        spurs and other irregularities caused by cervical spondylosis also may reduce
        the diameter of the canal that houses the spinal cord, resulting in cervical
        myelopathy. Both cervical radiculopathy and cervical myelopathy can lead to
        permanent disability.

Cervical Spondylosis, Mayo Clinic Staff, http://www.mayoclinic.com/print/cervical-spondylosis/DS00697 (Last accessed October 13, 2011).

[19]Neural foraminal narrowing or stenosis refers to the narrowing of the space or openings where spinal nerves exit on each side of the spinal column. Pain can result from the narrowing of the spinal nerve openings because there is an impingement or compression on the spinal nerve roots that exit through these openings.

[20]Subluxation is "an incomplete or partial dislocation."  Dorland's Illustrated Medical Dictionary, 1599 (27th Ed. 1988).

[21]"Lorazepam is in a group of drugs called benzodiazepines . . . It affects chemicals in the brain that may become unbalanced and cause anxiety.  Lorazepam is used to treat
                                                                    (continued...)

follows: "Probable anxiety attack.  Symptomatic treatment." Id.

On March 31, 2004, McKnight had an appointment with Dr. Wilson at the Guthrie Clinic. Tr. 481.  Dr. Wilson noted that McKnight had "a full workup now and is going back to work next week. He may need something for his panic attacks because I think he suffers from this as a result of his neck injury and his arm going numb." Id.

On June 18, 2004, McKnight had an MRI of the cervical spine performed at Soldiers & Sailors Memorial Hospital, Wellsboro. Tr. 372 and 377.[22]  The MRI was ordered by Dr. Bellows, the chiropractor. Id.   The MRI revealed "[c]entral canal stenosis[23] at C6-7 due to severe degenerative disc disease and a spondylotic disc protrusion asymmetric to the left" and a "[s]mall right paracentral/intraforaminal spondylotic disc protrusion at C5-6 causing right foraminal stenosis."  Id.

On June 28, 2004, McKnight had an appointment with Dr. Wilson at the Guthrie Clinic, Wellsboro. Tr. 480.  Dr. Wilson in his notes of this appointment states in toto as follows: "Comes in for comp check. Has a cervical strain and cervical disc disease.  He

---

[21](...continued)
anxiety disorders." Lorazepam, Drugs.com, http://www.drugs.com/lorazepam.html (Last accessed October 12, 2011).

[22]This is an example of the medical records contained within the administrative record being substantially out of order.  The second page of the MRI report was at page 372 of the administrative record and the first page of the report at page 377.

[23]Spinal stenosis is a medical condition in which the spinal canal narrows and compresses the spinal cord and nerves. "Depending on which nerves are affected spinal stenosis can cause pain or numbness in your legs, back, neck, shoulders or arms; limb weakness and incoordination; loss of sensation in your extremities; and problems with bladder or bowel function.Pain is not always present, particularly if you have spinal stenosis in your neck." Spinal Stenosis, Mayo Clinic staff, http://www.mayoclinic.com/health/spinal-stenosis/DS00515 (Last accessed October 13, 2011).

was off in April and reinjured himself again. He has been seen for chiropractic treatments, but since the MRI shows some changes at C5-6, more pronounced than before, he is going to see Dr. Anton at Sayre.[24]  Will await the results.  Gave him some Lortabs 10/500[25] for the pain. See for follow up." Id.

On July 19, 2004, McKnight had an appointment with Michelle L. Cavanaugh, M.D., Section of Family Practice, Guthrie Clinic, Wellsboro. Tr. 479.  Dr. Cavanaugh's notes of this appointment mention McKnight's "significant [neck]  pain" and the fact that he was receiving "some therapy and chiropractic care." The notes further state  as follows: "Patient comes in today wanting to be scheduled for physical therapy evaluation and treatment. . . He had an MRI done that revealed disc bulging at C5-C6 and C6-C7 that correlated with his symptoms.  He saw Dr. Anton earlier this month and he recommended surgery versus another trial of physical therapy.  At this point Mr. McKnight would like to try the physical therapy." Id.  Dr. Cavanaugh's assessment/plan was that McKnight suffered from "[c]ervical disc disease per Dr. Anton" and McKnight was scheduled for a physical therapy evaluation and treatment.  Id.  It was stated that if physical therapy failed surgical intervention would be considered.  Id.

On July 26, 2004, McKnight had an initial physical therapy evaluation at Phoenix Rehabilitation and Health Services, Inc., Mansfield, Pennsylvania. Tr. 266.  The

---

[24]The administrative record does not contain Dr. Anton's records.

[25]"Lortab contains a combination of acetaminophen and hydrocodone. Hydrocondone is in a group of drugs called narcotic pain relievers. Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone.  Lortab is used to relieve moderate to severe pain." Lortab, Drugs.com, http://www.drugs.com/lortab.html (Last accessed October 12, 2011).

physical therapist was Bretta Fabian.  The objective portion of the report of the physical therapy evaluation states as follows:  "Inspection: The patient sits and stands with the left shoulder lower and the neck tipped to the right. The patient also has a head forward posture. The patient has a scoliotic curve in the lower thoracic back which is concave to the left. The patient demonstrates right paracervical muscles that are hypertrophied[26] as compared to the left.  The left iliac crest is higher than the right and the right ASIS[27] is rolled severely anteriorly. Palpation: The patient is extremely tender in both upper trapezius muscles, left greater than right. The patient is tender in the thoracic back also." Id.   It was noted that McKnight's range of motion and  strength were essentially normal and that neurologically he was intact. Tr. 267.   The physical therapist's assessment was as follows: "This patient demonstrates significant postural malalignment and muscle imbalance in the cervical and thoracic back, as well as, the low back. The patient has subsequent loss of strength in the cervical region and the thoracic back/postural muscles." Id.  The plan was for McKnight to have 4 to 6 weeks of physical therapy. Id.

McKnight attended physical therapy sessions with Ms. Fabian on July 27 and 29, and August 2, 3, 5, 9, 11, 12, 16 and 17, 2004.  Tr. 268-269 and 271-272.  The notes of these sessions reveal that McKnight would have good days and bad days and that his pain would wax and wane depending on his level of activity.  The physical therapy note from August 16th includes the following statement of McKnight: "As long as I don't do much I am

---

[26]"Hypertrophic" is defined as a an enlargement or overgrowth of an organ or part of the body due to increased size of the constituent cells.  Dorland's Illustrated Medical Dictionary, 800 (27th Ed. 1988).

[27]"ASIS" is an abbreviation for anterior superior iliac spine.

pain free. I can't do things over my head. I tried to help my wife lift tubs of clothing onto a top closet shelf and I had severe pain in my neck for 4-5 hours afterward. Also my right leg pain comes and goes[.]" Tr. 272.

On August 17, 2004, Ms. Fabian reviewed McKnight's progress in a letter to Dr. Cavanaugh. Tr. 270. That letter states in pertinent part as follows: "This letter is in regard to Steve McKnight who is being treated in physical therapy for the diagnosis of C5-6, C6-7 disc bulge with nerve compression. The patient has progressed in physical therapy to a point where 75% of the time he is pain free if he is doing nothing. . . The patient continues to have symptoms of spasm and sever[e] pain if he uses his arms above his head.  The patient has attempted to help his wife with home activities and has experienced a flare up in symptoms. I believe the patient would benefit from continued therapy[.]" Id.

On August 18, 2004, McKnight had an appointment with Dr. Cavanaugh at the Guthrie Clinic, Wellsboro. Tr. 478.  Dr. Cavanaugh in her report of this appointment noted that McKnight had been attending physical therapy. Id.  She further made the following objective findings: " Generally – moving about without significant difficulty. Again, cannot raise his arms in front of him above 90 degrees or it causes some discomfort in the back of his neck. Minor discomfort throughout the cervical musculature. Range of motion is intact." Id.  Dr. Cavanaugh's assessment/plan was as follows: "Cervical disc herniation, trying to avoid surgery and regain his function so that he can go back to work at some point.  Will continue him off work for another month and continue therapy. Gave him a note for chiropractic manipulation also.  Will try him on Ibuprofen 800 mg every 8 hrs and Flexeril 10

mg every 8 hrs, especially at bedtime.[28] He will continue the Lorazepam 1 mg [every] 6 hrs [as needed] for anxiety symptoms." Id.

McKnight attended physical therapy sessions with Ms. Fabian on August 19, 23, 24, 26 and 30, and September 1, 7, 8 and 9, 2004. Tr. 272-276.  The notes of these sessions reveal that McKnight would have good days and bad days and that his pain would wax and wane depending on his level of activity.  On August 19th McKnight reported that "he woke up at 3 am this morning with increased spasm in both upper trapezius muscles." Tr. 272.  On August 23rd McKnight reported that "he had a terrible weekend. He started taking a muscle relaxor on Thursday and was in bed Friday and Saturday secondary to a type of allergic reaction . . . he was hunched up from chills and therefore had a (sic) increase in cervical spasm." Tr. 273.  On August 24th McKnight reported that "he had a little bit of neck tightness but [stated] he [felt] like he [was] doing better and that there [was] a little bit of spasm but not the grabbing that there was last week." Id.  On August 26th McKnight reported that "he [felt] like his neck [was] getting looser. He is going to attempt to use his cervical pillow tonight." Id.  On August 30th McKnight reported that "he was unable to use a cervical pillow secondary to upper extremity numbness during the night." Tr. 274.  On September 1st McKnight reported that he was "having increased cervical pain . . . [and] began experiencing stiffness in his neck two days ago." Id.  On September 7th McKnight reported: "I have had a terrible time. Last Wednesday when I lifted on Machine 6 I blew a disk in my neck and the next morning woke up with my whole right arm numb. I went to see the chiropractor . . . and

_____

[28]Flexeril is a muscle relaxant which works by blocking nerve impulses that are sent to the brain. Flexeril, Drugs.com, http://www.drugs.com/pro/flexeril.html (Last accessed October 13, 2011)

it was slightly better yesterday." Tr. 275.  On September 8th McKnight reported that "he felt good after he went home yesterday but after a short nap he had increased tightness in both upper trapezius muscles and pain at the insertion of these muscles at both AC joint[29] regions. [McKnight] used ice and heat and gentle exercise to decrease tightness . . . [and] report[ed] that he felt better this morning after getting up and relaxing. [McKnight reported he]  always has stiffness and pain in the morning." Id.  On September 9th McKnight reported that " his cervical muscles [were] relaxing much better" and he would "see the chiropractor today." Tr. 276.  He further reported that  "he was stiff when he awoke this morning but that he relaxed and the muscles relaxed." Id.

On September 9, 2004, McKnight had an initial appointment with Morgan L. Woodworth, D.C., of Woodworth Chiropractic Clinic, Covington, Pennsylvania. Tr. 369-370. Dr. Woodworth utilizes numerous abbreviations in her treatment notes and even though a "SOAP[30] NOTES KEY" is contained within the administrative record we are still unable to decipher most of her treatment notes using that key because of the poor quality of her handwriting. Tr. 532. We discern, however, that Dr. Woodworth made objective examination findings (utilizing the abbreviations)  as well as specified the type of manipulative treatments provided at each session.[31]

---

[29]The AC joint is the acromioclavicular joint, the joint at the top of the shoulder.

[30]"SOAP" is an abbreviation for subjective, objective, assessment and plan.

[31]Throughout this memorandum we will repeatedly mention that Dr. Woodworth made objective findings without specifying those findings.   Although we are unable to indicate the objective findings, we can tell that such findings were made based on the form that Dr. Woodworth utilized.  The form has a section entitled "Exam" with subsections entitled "TENDER," "M SP/TP," "ROM/ASSY," and "TESTS."   Based on our review of the
(continued...)

McKnight attended physical therapy sessions with Ms. Fabian on September 14, and 15, 2004. Tr. 277.  The notes of these sessions reveal that McKnight would have good days and bad days and that his pain would wax and wane depending on his level of activity.  On September 14th McKnight reported that "he saw Dr. Woodworth on Friday and did quite well with his appointment" and that "he feels the best that he has ever felt yesterday."  Id.  McKnight also stated that "he did a little more but he is not as tight this morning as he usually would have been." Id.  On September 15th McKnight reported that he was "doing quite well yesterday until 10. He had virtually no pain yesterday and he did not have any nausea or dizziness. . . he did not do much but he did not have any of those symptoms yesterday.  Last night at 10 he was sneezing with a sinus cold and he wrenched his neck and actually got a spasm in the left levator scapula." Id.

On September 15, 2004, McKnight had an appointment with Dr. Cavanaugh at the Guthrie Clinic, Wellsboro. Tr. 477.  Dr. Cavanaugh noted that McKnight was "progressing nicely with his therapy" and had "some mild tightness over the upper trapezius muscles but overall no deformities."  She further stated that McKnight's neck had "full range of motion in all directions" and continued McKnight's physical therapy and chiropractic treatment.  Id.  On September 18th Dr. Cavanaugh wrote a script on behalf of McKnight for Lorazepam. Tr. 486.

McKnight had a chiropractic session with Dr. Woodworth on September 16, 2004. Tr. 370.  The notes of this appointment are illegible.

McKnight attended physical therapy sessions with Ms. Fabian on September

---

[31](...continued)
SOAP Notes Key  "ROM" most likely is an abbreviation for range of motion.

16, 21, 22 and 23, 2004. Tr. 277-278.   On September 16th McKnight reported that "he attempted to get his X rays (sic) from the dr (sic) and was denied access to his X rays (sic) which upset him and caused increased spasm in both upper trapezius muscles."  Tr. 277. On September 21st McKnight reported that he was "able to do much more around the house without lifting any weights without an increase in symptoms." Tr. 278.  On September 22nd McKnight reported that "he was able to do light activities below shoulder level yesterday to fix the water heater in his basement without an increase in symptoms." Id.   On September 23rd McKnight reported that he was "tight in the left upper trapezius muscle." Id.

McKnight had a chiropractic session with Dr. Woodworth on September 23, 2004. Tr. 370.  The notes of this appointment are partially legible.  We can discern that Dr. Woodworth wrote: "Last 2wks Have Had More Good Days then have had in a long time. . . ." Id.   The remainder is illegible.

McKnight attended a physical therapy session with Ms. Fabian on September 27, 2004. Tr. 279.  The notes of this appointment state as follows: "[McKnight] reports that he was adjusted on Thursday and did well that day.  He did not have to take a rest and was able to do things around the house without increasing symptoms or fatigue. [McKnight] reported the weekend went well and that he had minimal to no spasm in the upper trapezius muscles. [McKnight] did have pain in the back of his neck that was 2-3/10 and [he] described as being right on the spine. Today [McKnight] reports that he did use ice this morning but the spasms were held at bay. [McKnight] reports he is talking with various locations to decide what kind of work he will be able to do in the future.  It is unlikely [McKnight] will be able to raise his arms over his head and work under cars with his neck tilted at this point in time. [McKnight] has significant damage to his neck and it will be difficult for him to work in this

position." Id.

McKnight had a chiropractic session with Dr. Woodworth on September 30, 2004. Tr. 370.  We can discern that Dr. Woodworth noted: "Was great till Tues[day] night woke middle of night with sneeze that aggravated neck and low back."  We cannot decipher the remainder.

McKnight attended physical therapy sessions with Ms. Fabian on September 30 and October 5, 2004. Tr. 279-280.   On September 30th McKnight reported that "he had a sinus infection yesterday and that he sneezed a lot and that his neck is rather sore today." Tr. 279.  It was noted that McKnight had "minimal to moderate spasm in the right cervical muscles." Id.  On October 5th McKnight reported that he "was adjusted last week and following that adjustment [he] was sore in [his] upper shoulders but [his] neck felt better and [his] hand didn't go numb [when he] did [] stretches."  Tr. 280.

McKnight had a chiropractic appointment with Dr. Woodworth on October 7, 2004. Tr. 370.   The notes of this appointment are illegible.

McKnight attended physical therapy sessions with Ms. Fabian on October 8, and 12 , 2004. Tr. 280-281. On October 8th McKnight reported "continued improvement with improved upper extremity utilization since beginning physical therapy treatment." Tr. 280. On October 12th McKnight reported that he was "having less symptoms in the arms, [that is] less numbness and tingling" and "that most of his pain is in the back of his neck right on his spinous processes." Tr. 281.

McKnight had a chiropractic appointment with Dr. Woodworth on October 18, 2004. Tr. 355.   The notes of this appointment are partially legible.  The notes state in part: "Last WK Best WK since Incident, [unt]ill yest[erday] carried groceries for wife. . .[Sat] in Hot

Tub last night Mild [low back pain]." Id. Dr. Woodworth made objective physical examination findings. Id.

McKnight attended physical therapy sessions with Ms. Fabian on October 18 and 20, 2004.  Tr. 282.  The notes of these sessions reveal that McKnight's pain would wax and wane depending on his level of activity.  On October 18th McKnight reported that "[a]fter [his] last treatment [his] neck felt so much better. In fact [he] had a lot of hope because [he] had a little neck pain until Sunday at which time [he] took a trip to Buffalo on a bumpy road. [He] had increased neck pain and [he] attempted to carry 10 [pounds] in each hand for 15 minutes and [he] could not do it because of increased pain in the tops of [his] shoulders." McKnight further reported that "[his] muscles felt weak last night but after a Jacuzzi bath and some traction [he] feel[s] only tightness now." Id.   On October 20th McKnight reported that he was "doing better . . . however chin tucks don't bother him while he is performing them but latter once in a while he gets a sharp pain in the neck which goes away quickly." Id.  It was noted at this appointment that McKnight had "very minimal spasm present in the cervical region." Id.

On October 20, 2004, McKnight had an appointment with Dr. Cavanaugh. Tr. 476.  Dr. Cavanaugh in the report of that appointment stated as follows: "Apparently the therapist thinks he is still getting improvement, so will continue their current modalities, Will see him back in two months, sooner if he feels he can get back to work sooner. At this point, however, I think that any overhead work such as his job as a mechanic is not going to be possible for the future for him." Id.

McKnight attended physical therapy sessions with Ms. Fabian on October 21 and 25, 2004. Tr. 282-283. The notes of these sessions reveal that McKnight would have

good days and bad days and that his pain would wax and wane depending on his level of activity.  On October 21st Ms. Fabian noted that McKnight was "having very few symptoms presently as long as he doesn't over do it as per [patient's] report."  Tr. 282.  On October 25th McKnight reported that "he has had a little bit of spasm but that he [was] feeling pretty good."  Tr. 283.

McKnight had a chiropractic appointment with Dr. Woodworth on November 1, 2004.  Tr. 355.  The notes state in part: "1st week ok.  Last Tues[day] had stomach virus with sweats, [neck] tight.  Bad through Friday, Presently Neck pain at base of neck . . ."  Id.  We are unable to decipher the remainder.  Dr. Woodworth made objective physical examination findings.  Id.

McKnight attended physical therapy sessions with Ms. Fabian on November 1, 2, 4, 8, 9, 11, 15,  2004.  Tr. 272-285.  The notes of these sessions reveal that McKnight would have good days and bad days and that his pain would wax and wane depending on his level of activity.  On November 1st McKnight reported an increase in cervical spasm; on November 2 he reported soreness in the upper trapezius muscles but no pain in the cervical region; on November 4th he reported he was doing much better; on November 8th he reported he had a good weekend with no increase in symptoms and he did a lot of activity the day before including cleaning the garage; on November 9th he reported he has spasms in the right upper trapezius and shoulder; on November 11th he reported he was quite sore in the right upper trapezius and cervical region after cleaning house and taking a trip; and on November 15th he reported that "he carried shopping bags that were 3-4 [pounds] each to the mall yesterday and did not experience pain while doing so [but] later realized that he had an increase in spasm in both upper trapezius muscles which lasted till this morning."  Id.

25

On November 15, 2004, Ms. Fabian reviewed McKnight's progress in a letter to Dr. Cavanaugh. Tr. 287. That letter states in pertinent part as follows: "This letter is in regard to Steve McKnight who is being treated in physical therapy for the diagnosis of C5/C6, and C6/7 disc bulge with nerve compression.  ROM is within normal limits in the cervical region at this point in time. Strength is within normal limits in the cervical region and is 4/5 in the upper extremities, below shoulder level. The patient continues to progress gradually. Recommendations: I recommend therapy to gain full strength and normal function for this  patient." Id.

McKnight had a chiropractic appointment with Dr. Woodworth on November 15, 2004. Tr. 355.  We are unable to decipher the notes relating to this appointment.  Dr. Woodworth made objective physical examination findings. Id.

On November 17, 2004, Dr. Woodworth issued a typewritten report relating to McKnight's progress. Tr. 366-368.  That report states in pertinent part as follows:

> Initial date of Treatment – Dr. Cavanaugh . . . referred Steve to this clinic for chiropractic treatment of disc disease.
> Presenting Symptoms – stiff neck and pain involving right arm and legs.
> Other Symptoms Apparent since the Injury – nervousness, tingling arms, chest pain, loss of balance, cold sweats, depression, sleeping trouble, dizziness, fatigue, neck pain and stiffness, fingers numb, diarrhea, anxiety, tingling legs, other symptoms of sweaty hands and feet.
>
> *      *      *      *      *      *           *
>
> Symptoms Immediately after Injury – numbness and pain into left arm and chest.
> Doctors Seen and Treatment Received since the Injury – patient was taken to hospital, and the next Day a stress test was performed.  The following Monday Steve saw a cardiologist at Robert Packer hospital

who ordered a (sic) MRI of his neck and differentially diagnosed H.N.P.[32] of C6 7 disc, Dr. St. John's performed neurosurgical evaluation.  Drs Wilson and Cavanaugh managed care locally; Dr. Bellows treated from October 03 through June 04 Chiropracticly.  Phoenix rehab has also been doing physical therapy and rehabilitation.

\*          \*          \*          \*          \*          \*               \*

Present Medications – lorazepam.
Mechanism of Injury – working under vehicle reaching overhead pulling with arms.

\*          \*          \*          \*          \*          \*               \*

Initial Exam and Treatment
Palpation – myospasms: anterior, lateral and posterior C-pvm's, suboccipital triangle. Mild wasting left triceps, biceps with active trigger points to belly of m's.  Pain on palpation of C1-right, T1 right spinous process, T6 spinous, left sacral-ala.

Range of motion – C-flexion caused locking pain to lower cervical @ 45, extension caused pain @ 30.

\*          \*          \*          \*          \*          \*               \*

Orthopedic and Neurological Findings – Jackson compression test[33] positive on right to lower cervical.

Subluxation Findings of Segments with Decreased Range of Motion and Asymmetry – C6 XLT, T1 PR, C1 XRT, T6 anterior, right sacral base anterior

\*          \*          \*          \*          \*          \*               \*

Assessment – Patient is responding favorably to treatment but due to the chronicity of the problem and the extent of his injuries, I am unable to determine how rapidly he will improve at this time.

---

[32]"HNP" is an abbreviation for herniated nucleus pulposus.

[33]This test involves the examiner rotating the patients head to one side and then carefully pressing down on the head and then rotating to the other side and again pressing down. The test is positive if pain radiates into the arm.  A positive test suggest that that a nerve root is affected.

Tr. 366-368

McKnight attended a physical therapy session with Ms. Fabian on November 18,  2004. Tr. 286.  The notes of that session reveals that McKnight 's pain would wax and wane.   At this appointment McKnight reported that on "Tuesday he felt pretty good, but Wednesday morning he woke up and both upper trapezius muscles were bad" and "[h]e spent most of that evening at the ER till 2 in the morning." Id.

McKnight had a chiropractic appointment with Dr. Woodworth on November 23, 2004. Tr. 365.   We are unable to decipher the notes relating to this appointment.  Dr. Woodworth made objective physical examination findings. Id.

McKnight attended physical therapy sessions with Ms. Fabian on November 22,24 and 30,  2004. Tr. 288-289.  The notes of these sessions reveal that McKnight 's pain would wax and wane.

On November 30, 2004, McKnight had an appointment with Lee C. Meyers, M.D., Section of Family Practice, Guthrie Clinic, Wellsboro. Tr. 475.  At that appointment McKnight complained of diarrhea and crampy abdominal pain which had lasted for one week. Id.  The physical examination revealed "mild tenderness right lower quadrant and epigastrium, but no rebound or guarding, nondistended." Id.

McKnight attended a physical therapy session with Ms. Fabian on December 6, 2004. Tr. 290.   On that date McKnight reported having "been very sick" and "feeling very shaky." Id.

McKnight had a chiropractic session with Dr. Woodworth on December  6, 2004. Tr. 355.  We are unable to decipher the notes relating to this appointment.   Dr. Woodworth made objective physical examination findings. Id.

McKnight attended physical therapy sessions with Ms. Fabian on December 8, and 9, 2004. Tr. 290.  The December 8th physical therapy note states that McKnight had "plateaued at this point and we will consider discharge on 12/09/04 to an independent HEP.[34]  The patient may require [physical therapy] in the future but will require strengthening at this level for  some time." Id. The December 9th physical therapy note states that "[t]he patient is still unable to lift his arms above his shoulders with any kind of weighted or unweighted activity"[35] and "[t]he patient will be discharged at this time." Id.

On December 9, 2004, Ms. Fabian reviewed McKnight's progress in a letter to Dr. Cavanaugh. Tr. 291. That letter states in pertinent part as follows: "The patient reports that he is 80% better and that he is not having such severe spasms in the upper trapezius muscles and he is able to self treat the symptoms at home.  He has reached  a plateau in his exercise program where he may need to maintain this level of exercise  for some time before he is able to progress. The patient is still unable to perform any weighted or un-weighted activities with arms above the shoulder level." Id.   McKnight was discharged from the physical therapy program but directed to "continue with the Wellness program at Phoenix Rehabilitation" and continue chiropractic care.  Id.

McKnight had a chiropractic appointment with Dr. Woodworth on December 27,  2004. Tr. 355.  We are unable to decipher the notes relating to this appointment.  Dr. Woodworth made objective physical examination findings. Id.

On December 28, 2004, McKnight had an appointment with Dr. Meyers. Tr.

---

[34]"HEP" is an abbreviation for Home Exercise Program.

[35]The significance of McKnight's lack of ability to lift items above his shoulders will become clear *infra* when we discuss the errors committed by the administrative law

474.  Dr. Meyers refilled McKnight's prescription for Lorazepam. Tr. 486.   Dr. Meyers's assessment was that McKnight suffered from a cervical disc herniation and stated that McKnight should "continue exercises as outlined by physical therapy." Tr. 474.  He further indicated that "[i]t would certainly be difficult for [McKnight] to go back to work at this time in his current job, which requires overhead work. Therefore, we will keep him off work and will see him back in two months." Id.

On January 11, 2005, McKnight had an appointment with Dr. Woodworth. Tr. 354.  As stated earlier in this order we are unable to interpret many of Dr. Woodworth's handwritten notes[36] but we can discern based on the typewritten form she utilized that she did make some objective examination findings. Tr. 354.  Those objective findings were handwritten.  Id.

On January 17, 2005, McKnight recommenced physical therapy with Ms. Fabian. Tr. 292.  The physical therapy evaluation on that date revealed that McKnight was "not able to do activities overhead secondary to cervical pain and arm symptoms." Id.  Ms. Fabian noted that McKnight was "tender to palpation in both upper trapezius muscles" and "very tight and tender to palpation at the base of the occiput."[37] Id.  Ms. Fabian stated that cervical rotation and side bending was decreased by 1/4 bilaterally. Id.  She also stated that McKnight could not lift items above his head. Id.

McKnight had physical therapy sessions  with Ms. Fabian on January 20,  25,

---

[36]The notes of this particular appointment do suggest that McKnight had decreased range of motion of the cervical, lumbar and thoracic spine. Tr. 354.

[37]Occiput is defined as "the back part of the head." Dorland's Illustrated Medical Dictionary, 1164 (27th Ed. 1988).

27 and 31, 2005. Tr. 294-296.  The notes of these  sessions reveal that McKnight's pain and spasms waxed and waned.

On  January  31,  2005,  McKnight  had  a  chiropractic  session  with  Dr. Woodworth. Tr. 354.  Dr. Woodworth made objective physical examination findings.[38] Id.

McKnight attended physical therapy sessions with Ms. Fabian on February 2, 7, 8 and 14, 2005. Tr. 296-298.  The notes of these sessions reveal that McKnight  would have good days and bad days and that his pain and spasms would wax and wane depending on his level of activity.

Also, on February 14, 2005, McKnight had a chiropractic session with Dr. Woodworth. Tr. 354.  Dr. Woodworth made objective physical examination findings. Id. Dr. Woodworth's notes on this date include a portion that was typewritten which states as follows: "Mr. McKnight has experienced some exacerbations involving his neck due to coughing from a common cold and exposure to cold temperatures on his neck.  Chiropractic treatment still brings on quite effective reduction in symptoms and restoration of range of motion.  He is being seen at 2-3 week intervals because of flare-ups. I am trying to increase the interval to 1 month." Tr. 357.

McKnight attended physical therapy sessions with Ms. Fabian on February 16, 22, and 24, 2005. Tr. 298-299.  The notes of these sessions reveal that McKnight would have good days and bad days and that his pain and spasms would wax and wane depending on  his level of activity.

On February 24, 2005, Ms. Fabian reviewed McKnight's  progress in a letter

---

[38]The significance of these objective findings will become clearer *infra* when we discuss the errors committed by the administrative law

to Dr. Meyers. Tr. 300. That letter states in pertinent part as follows: "This letter is in regards to Steve McKnight who is being treated in physical therapy for cervical pain. Patient has attained a 0/10 pain rating consistently and has gained full ROM and strength for this patient in the cervical region and upper extremities. The patient is still unable to lift weights above shoulder level without increasing symptoms in the cervical region and upper traps. The patient will be discharged to an independent HEP at this point in time." Id.

On February 28, 2005, McKnight had an appointment with Dr. Meyers at the Guthrie Clinic, Wellsboro. Tr. 474. At that appointment McKnight stated that "from the standpoint of his neck things [were] getting better" but that he was "having some trouble with his lower back." Id. Dr. Meyers's physical examination of McKnight revealed "[s]ome tenderness in the lumbar spine area that was not present before." Id. Dr. Meyers's assessment and plan was as follows: "Cervical spine disc herniation. Continue with Physical Therapy. He was given a noted to stay off work until he sees me back." Id. Also, Dr. Meyers authorized a refill of McKnight's prescription for Lorazepam. Tr. 486.

On March 1, 2005, McKnight had a chiropractic session with Dr. Woodworth. Tr. 354. Dr. Woodworth made objective physical examination findings. Id.

On March 22, 2005, McKnight had an appointment with Ms. Fabian. Tr. 301-303. The physical therapy evaluation on that date revealed that McKnight was "not able to do activities overhead secondary to cervical pain and arm symptoms." Id. McKnight had "greater tightness in the left upper trapezius than the right" and "[c]ervical rotation [was] decreased by 1/4 bilaterally." Id. Ms. Fabian's assessment was that McKnight "demonstrate[d] moderate to severe muscle spasm left greater than right upper trapezius."

Id.  Ms. Fabian prescribed a TENS[39] unit. Id.

On March 29, 2005, McKnight had a chiropractic session with Dr. Woodworth. Tr. 354.  Dr. Woodworth made objective physical examination findings. Id.  Dr. Woodworth's notes on that date included a portion that was typewritten which states as follows: "I advised the patient to increase his activity, since his 1-3-05 visit. He reported that he did pretty well for three weeks until he tried to rake the yard, which gave him spasms at the base of his neck and into the trapezius muscle. His wife got a tens (sic) unit from Phoenix rehabilitation, which he is using.  He will be seen at 3 to 4-week intervals barring complications." Tr. 357.

On March 30, 2005, McKnight had an appointment with Ms. Fabian. Tr. 304. At that appointment McKnight reported "that he was outside raking on Saturday and then attempted to use the TENS unit for muscle spasm but nothing would reduce the muscle spasm . . . He did then receive a massage which helped reduce spasm [and] [h]e was adjusted on Monday which alleviated all spasm." Id.  Ms. Fabian noted McKnight would attempt to use the TENS unit for two more weeks for muscle spasm and would follow-up with him at the end of the two weeks. Id.  Our review of the administrative record did not reveal that McKnight had any further appointments with Ms. Fabian and did not have a physical therapy appointment at Phoenix Rehabilitation and Health Services, Inc., until October 10, 2006. Tr. 305.

On April 19, 2005, McKnight had a chiropractic session with Dr. Woodworth. Tr. 352.  Dr. Woodworth made objective physical examination findings. Id.

On May 2, 2005, McKnight had an appointment with Dr. Meyers at the  Guthrie

---

[39]"TENS" is an acronym for transcutaneous electrical nerve stimulation.  The unit provides electrical stimulation for pain control.

Clinic, Wellsboro. Tr. 472.  At that appointment McKnight stated that "he has good days and bad days" and that "[o]n his good days he has fairly good range of motion without any nausea or dizziness. However, on his bad days he gets significant nausea, dizziness, spasms in his neck and very decreased range of motion." Id.  Dr. Meyers's physical examination revealed that McKnight had "decreased range of motion at the cervical spine as well as some cervical spine muscle tightness." Id.  Dr. Meyer's observed "no radicular symptoms." Id. Dr. Meyers's assessment was that McKnight suffered from a cervical spine disc herniation. Id.    Dr. Meyers continued McKnight's home exercise program and authorized a refill of McKnight's prescription for Lorazepam. Tr. 486.

On May 10 and June 7, 2005, McKnight had chiropractic sessions with Dr. Woodworth.  Tr. 352.  Dr. Woodworth made objective physical examination findings. Id.  The May 10th notes appear to indicate that McKnight had neck pain which radiated to the left biceps, forearm and hand. Id.

On June 28, 2005,  McKnight had a chiropractic session with Dr. Woodworth. Tr. 352.  Dr. Woodworth made objective physical examination findings. Id.

On July 12, 2005, McKnight had an appointment with Dr. Meyers at the Guthrie Clinic, Wellsboro. Tr. 470.  At that appointment McKnight stated that "he has good days and bad days" and that "on the average week he [] has four bad days and three good days."  Id. Dr. Meyers's assessment was that McKnight suffered from a cervical spine disc herniation. Id.   Dr. Meyers ordered an MRI of the cervical spine.  Id.

On July 18, 2005, McKnight had an MRI of the cervical spine performed at Soldiers & Sailors Memorial Hospital, Wellsboro. Tr. 497.  The MRI revealed "hypertrophic spurring at C6-C7 and a broad based disc herniation at C6-C7 that was asymmetric to the

left and caused mild central canal stenosis and foraminal narrowing predominantly on the left side. Id.  There was significant osteophyte (spurring) formation at the C6-C7 level.  At the C5-C6 level there was a very mild annular bulge without significant osteophyte formation. Id.  It was stated that McKnight had "severe disc degeneration with herniation at C6-7." Id.

On July 19, 2005,  McKnight had a chiropractic session with Dr. Woodworth. Tr. 352.  Dr. Woodworth made objective physical examination findings. Id.

On July 29, 2005, McKnight had an appointment with Dr. Meyers at the Guthrie Clinic, Wellsboro. Tr. 469.   At that appointment McKnight complained of respiratory problems. Id.   Dr. Meyers suspected that McKnight was suffering from anxiety. Id.

On August 2, 2005, McKnight had an appointment with Douglas Chyatte, M.D., a neurosurgeon, at Geisinger Medical Center, Danville, Pennsylvania. Tr. 250. Dr. Chyatte's assessment was that McKnight suffered from mechanical neck pain as the result of a degenerated disk at C6-C7 and offered him an anterior cervical discectomy and fusion at C6-C7. Id. McKnight advised Dr. Chyatte that he wanted to think about it. Id.

On August 9 and  30, September 20 and October 11,  2005,  McKnight had chiropractic sessions with Dr. Woodworth.  Tr. 352.  Dr. Woodworth made objective physical examination findings. Id.  Dr. Woodworth's  notes of September 20th  include a portion that is typewritten which states as follows: "Mr. McKnight is still undergoing supportive care and is being seen on a two-week interval basis.  Attempts at increasing this time interval between visits have been tried but his symptoms of neck pain and headache seem to be intolerable when increased. . . His restrictions are permanent but we discussed returning to work in a sedentary job or vocational rehabilitation for another career if possible." Tr. 357.

On October 26, 2005, McKnight had an appointment with Dr. Meyers at the

Guthrie Clinic, Wellsboro. Tr. 468.    The notes of this appointment refer to McKnight's evaluation by the neurosurgeon at Geisinger.  Id.  They also refer to an independent medical examination by a Dr. Rajjoub.  Id.    The administrative record does not contain the report of Dr. Rajjoub's examination.    Dr. Meyers's assessment was the same, i.e., McKnight suffered from cervical disc disease and McKnight should follow-up with a neurosurgeon. Id. Dr. Meyers ordered an MRI of McKnight's lumbar spine because McKnight was complaining of right leg pain.  Dr. Meyers noted that McKnight "is clearly not able to go back to work and his usual activities until we get his neurologic problems straightened out." Id.  Also, Dr. Meyers authorized a refill of McKnight's prescription for Lorazepam. Tr. 486.

On November 1, 2005, McKnight had a chiropractic session with Dr. Woodworth.  Tr. 353.  Dr. Woodworth made objective physical examination findings. Id.

On November 8,  2005, McKnight had an appointment with Dr. Meyers at the Guthrie Clinic, Wellsboro, complaining of chest discomfort. Tr. 467.  Dr. Meyers suspected a viral illness.  Id.

On November 19, 2005, McKnight visited the emergency department of Soldiers & Sailors Memorial Hospital, Wellsboro, complaining of chest pain. Tr. 436. McKnight was admitted to the Intensive Care Unit .  Id.  McKnight had several diagnostic tests, including a chest x-ray which was normal and a myocardial perfusion scan which was negative. Tr. 444 and 591.  McKnight was discharged from the hospital on November 21, 2005. Id.  Blood tests were also performed which revealed an elevated cholesterol level. Tr. 442 and 466.   At discharge he was prescribed the following medications: Metoprolol,[40]

---

[40]"Metoprolol is in a group of drugs called betablockers. . .Metoprolol is used to treat
(continued...)

Protonix, and Zocor.[41] Tr. 436.

On November 22, 2005,  McKnight had a chiropractic session with Dr. Woodworth.  Tr. 353.  Dr. Woodworth made objective physical examination findings. Id.

On November 30, 2005, McKnight had an appointment with Dr. Meyers at the Guthrie Clinic, Wellsboro. Tr. 466.  Dr. Meyers concluded that McKnight's chest pain was related to his cervical spine condition. Id.  Dr. Meyers directed that McKnight follow-up with a neurosurgeon. Id.

On December 13, 2005, and January 3 and 23, and February 14, 2006, McKnight had chiropractic sessions with Dr. Woodworth.  Tr. 353.  Dr. Woodworth made objective physical examination findings. Id.  Dr. Woodworth's  notes of the January 3, 2006, session  include a portion that is typewritten which states as follows: "Mr. McKnight continues to suffer left arm pain and neck pain.  He is bothered by cold weather. On November 19, 2005, he went to the ER with neck and left arm pain. He was evaluated for heart problems and told that it was not heart but perhaps an HNP with entrapment syndrome. Chiropractic treatment does reduce his spinal and radicular symptoms but the flare-ups are becoming more frequent and severe." Tr. 357.

On February 20, 2006, McKnight was evaluated by Aaron J. Kolb, M.D., at Susquehanna Health System in Williamsport, Pennsylvania.  Tr. 325-327.  Dr. Kolb in his report notes that McKnight was evaluated by Dr. Rodwan Rajjoub on October 18, 2005, and

---

[40](...continued)
angina (chest pain) and hypertension (high blood pressure)."  Metoprolol, Drugs.com, http://www.drugs.com/metoprolol.html (Last accessed October 14, 2011).

[41]Zocor is a drug used to control cholesterol levels in the blood. Zocor, Drugs.com, http://www.drugs.com/zocor.html (Last accessed October 14, 2011).

that Dr. Rajjoub concluded that McKnight had a herniated disc at C6-C7 and that McKnight would benefit from surgery.[42] Tr. 325. Dr. Kolb mentions a report by Dr. Hani Tuffaha dated December 21, 2005, in which Dr. Tuffaha recommended surgical treatment of McKnight's cervical problem with an anterior cervical discectomy and fusion at C6-C7.[43] Dr. Kolb also stated there were MRI reports of the cervical spine from October 27, 2003, June 18, 2004, and July 18, 2005, which revealed, respectively, "moderate to severe disc space narrowing with a broad based C6-C7 disc herniation," "central canal stenosis at C6-C7 with severe degenerative disease and spondylosis disc protrusion" and "persistent severe disc degeneration with herniation of C6-C7. . . primarily to the left side with a mild central canal stenosis and foraminal narrowing on the left." Id.

Dr. Kolb stated that McKnight reported pain in the neck, spine, shoulders, chest and also the right calf area and that he had headaches and a problem with acid reflux. Tr. 326. In his report Dr. Kolb set forth the following examination findings:

> The patient is a well-developed, well-nourished male. Blood pressure is 140/98. Pulse is 86. Respirations are 16. His height is 6 foot 3 inches. His weight is 198 pounds. He is somewhat guarding in motion of his neck. He is otherwise alert and oriented to time, person, and place. He walks with a normal gait. He has little guarding involving the lumbar spine. He has no significant calluses on his hands. He used no assistive devices at any time coming to our office. He was cooperative throughout. His affect was normal. He generally appears comfortable. He sat up for more than an hour except for short periods of time to lay down and stand and walk during the examination. There was straightening of the cervical spine. The lordotic curve of the lumbar spine was maintained. He had a normal gait. Pelvis and shoulders were level and symmetrical. There was no obvious atrophy in either the legs or arms. He had decreased range of motion of the spine to

---

[42]The administrative record does not contain Dr. Rajjoub's report.

[43]The administrative record does not contain Dr. Tuffaha's report.

the right. Specifically, he rotated to the right 45 degrees and to the left 60 degrees.  Flexion to the left was only 25 degrees and to the right about 30 degrees.  Forward flexion was also decreased along with the extension.  He had mild tenderness to touch and palpation in the cervical and trapezium areas but it was not severe.  He had no tenderness in the lumbar spine.  He demonstrated a normal range of motion of the low back.  He had a decreased reflex in the left bicep. He had reduced sensation to pinprick in the thumb and index finger and at the web space between the thumb and index finger but no where else in the hand. . . He had no difference in light touch or two point discrimination.  He had no evidence for atrophy when comparing the upper arms or the forearms with circumferential measurement. He moves the shoulders through a good range of motion.  There was no apparent difficulty in any of those.  He had grossly equal strength. He had normal reflexes in the lower extremities.  He had negative straight leg raising. He had an area of decreased sensation to pinprick along the inner aspect of the calf down to the ankle area and none on the foot. He had good pulses and good skin color and temperature. There was no unusual sweating. Review of the pain status inventory from Chapter 18 of the AMA guides showed a moderate to severe degree of impairment related to pain.  I reviewed the MRIs that were reported earlier and the findings described were readily apparent on the studies.

Tr. 326-327.  Dr. Kolb's assessment was that McKnight suffered from a herniated nucleus pulposus at C6-C7 with radiculopathy[44] of the left upper extremity; degenerative changes at C5-C6 with some foraminal stenosis without any apparent clinical affect, and right lower extremity numbness in a possible L5 distribution. Id.

On March 7, 2006, McKnight had a chiropractic session with Dr. Woodworth.

---

[44]Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord.  They carry signals to the rest of the body at each level along the spine. Radiculopathy is a result of disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes). See, generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.com/radiculopathy/article .htm (Last accessed October 14, 2011).  A herniated disc is one cause of radiculopathy. Id. Radiculopathy is a step beyond degenerative disc disease and severe cases may requires surgical intervention. Id.  However, "the majority of patients respond well to conservative treatment options." Id.

Tr. 350.  Dr. Woodworth made objective physical examination findings. Id.  It appears[45] that Dr. Woodworth noted that McKnight was dizzy and had neck pain which radiated to the side of the chest. Id.

On March 21, 2006, Guthrie Clinic authorized a refill of McKnight's prescription for Lorazepam. Tr. 486.

On March 28, 2006, McKnight had a chiropractic session with Dr. Woodworth. Tr. 350.  Dr. Woodworth made objective physical examination findings. Id.  It appears that Dr. Woodworth noted that McKnight "a week ago on Saturday woke with spasm [which] was bad throughout [the] week [at the] mid neck area." Tr. 350.

On March 29, 2006, Dr. Woodworth entered a typewritten note into McKnight's medical records which states in toto as follows: "Mr. McKnight is still being seen on a three week basis, which he still has acute exacerbation with mild causal relationship. Treatment still causes temporary reduction in symptoms and conditions, but the apparent HNP entrapment condition appears unstable at this time.  Due to the fact that we are giving relief temporarily, we are continuing care on a supportive basis until further evaluation and possible neurosurgical intervention might be necessary." Tr. 356.

On April 18, May 9 and 30, June 20, and July 3, 2006,  McKnight had chiropractic sessions with Dr. Woodworth.  Tr. 350-351.  Dr. Woodworth made objective physical examination findings. Id.

On July 14, 2006, McKnight had an appointment with Hani J. Tuffaha, M.D., a neurosurgeon, in Williamsport, Pennsylvania. Tr. 343.   At that appointment McKnight

---

[45]We are not certain of our interpretation of Woodworth's handwriting and use of abbreviations. However, it is clear that there were objective physical examination findings.

described "more frequent and more intense left arm pain" and "bilateral thumb and index finger numbness." Id.  McKnight also described "left anterior chest pain and 'a lot of neck pain.'" Id.  Dr. Tuffaha's physical examination of McKnight reveals that McKnight appeared uncomfortable and

> examination of the neck reveal[ed] moderately severe limitation of range of motion in all directions, especially on extension and left lateral rotation. Examination of the low back reveals full and painless range of motion at the waist. Left and right straight leg raising up to 90 degrees, results in no difficulty.  There are no myelopathic findings.  Deep tendon reflexes are symmetrically diminished.

Id.  Dr. Tuffaha's assessment was that McKnight suffered from a "[c]hronic broad based [herniated nucleus pulposus] C6-C7 left more than right with intractable cervical and left arm pain." Id.  Dr. Tuffaha ordered repeat cervical and lumbar MRI scans. Id.

On July 19, 2006, McKnight had an MRI of the cervical spine which revealed "[f]ocally advanced disc and degenerative disease . . . at the C6-7 level with some interval worsening of disc protrusion/bulging at this level, now encroaching upon both the right and left neural foramina. No spinal stenosis is seen." Tr. 378.  The report of the MRI also noted "disc dessication[46] is present at essentially every level. There is marked disc narrowing, endplate changes and bulging, with associated osteophyte formation, at C6-7 as was previously noted."  Id.

Also, on July 19, 2006, McKnight had an MRI of the lumbar spine which revealed "[d]isc degeneration at L1-2 and L2-3, and perhaps to a lesser extent at L5-S1, however, there is no significant disc bulging or herniation at any of these levels." Tr. 376.

On July 24, 2006, Guthrie Clinic authorized a refill of McKnight's prescription

---

[46]Disc dessication is where the discs lose water content and disc height.

for Lorazepam. Tr.  486.

On  July 25, 2006,  McKnight had a chiropractic session with Dr. Woodworth. Tr. 351.  Dr. Woodworth made objective physical examination findings. Id.   It appears that Dr. Woodworth noted that McKnight's left arm was numb the past 2 weeks and he had a lot of neck pain the past 3 days. Id.

On August 2, 2006, McKnight had an appointment with Dr. Meyers at the Guthrie Clinic, Wellsboro. Tr. 465.  The report of this appointment notes that McKnight was scheduled to have  surgery performed on August 14, 2006, by Dr. Tuffaha. Id.  Dr. Meyers apparently scheduled an appointment for preoperative clearance for McKnight and authorized a refill of McKnight's prescription for Lorazepam for anxiety and muscle spasms. Tr. 465 and 486. On August 8, 2006, McKnight had blood work which was normal. Tr. 493-494.

On August 8, 2006, McKnight had a chiropractic session with Dr. Woodworth. Tr. 351 and 356.  Dr. Woodworth made objective physical examination findings. Id.  On that date,  Dr. Woodworth entered a typewritten note into McKnight's medical records which states in part as follows: "Patient scheduled [for] . . . surgery for his neck on 8/14/2006. I am going to discontinue care for him at this time, waiting to see if care is needed for post stabilization and if care is resumed it would be very conservative." Id.

On August 14, 2006, McKnight was  admitted to the Williamsport Hospital and underwent an "[a]nterior discectomy [at the] C6-C7 level with decompression of the C7 nerve root and anterior fusion using trabecular metal spacer and demineralized bone matrix by Dr. Tuffaha." Tr. 338.  McKnight was discharged from the hospital on August 15, 2006. Id. The discharge summary states in part as follows:

> Postoperatively, he did very well.  His arms "feel great."  He has some incisional pain.
>
> By 08/15/06, he was tolerating PO[47] and out of bed.  He had no hoarseness.  His drain was removed.  He remained in good general condition and was discharged home with a follow up appointment in the office on 08/25/06.  He was asked to resume his diet as tolerated.  He was given postoperative laminectomy instruction sheet, as well as prescriptions for Lortab and Skelaxin.[48]

Tr. 339.

On August 28, 2006, McKnight had a follow-up appointment with Dr. Tuffaha at his office in Williamsport. Tr. 337.  It was noted that examination of McKnight's neck revealed "moderate limitation of motion in all directions" and "[t]he incision was well-healed." Id.  Also, McKnight was stable neurologically. Id.   Dr. Tuffaha's impression was that McKnight was having a "[s]atisfactory course following anterior cervical discectomy with fusion." Id.  Dr. Tuffaha ordered x-rays of the cervical spine. Id.

An x-rays of the cervical spine taken on September 27, 2006, revealed: "Status post anterior cervical fusion at C6-7 with interbody bone screw.  No fracture.  No motion is seen with flexion or flexion at any level." Tr. 329.

On October 10, 2006, McKnight had a physical therapy evaluation by Amy Farrer, a physical therapist, at Phoenix Rehabilitation and Health Services, Inc.  Tr. 305 and 307.  Under the subjective portion of Ms. Farrer's report she  states that McKnight "decided a year ago to have surgery. With insurance constraints it was not approved until recently. He

---

[47]"PO" or "per os"  is an indication that McKnight was taking food and water by mouth.

[48]Skelaxin  is a muscle relaxant which works by blocking nerve impulses that are sent to the brain. Skelaxin, Drugs.com, http://www.drugs.com/pro/skelaxin.html (Last accessed October 17, 2011)

underwent an anterior cervical discectomy and fusion . . . He currently presents to therapy with weakness, pain, limitations in movement, and is anxious to return to his previous functional activity." Id. Ms. Farrer's physical examination of McKnight revealed that McKnight had "some forward head positioning with obvious guarding at the neck and upper trapezius;" "minimal to no trunk rotation or arm swing with walking;" "some tenderness throughout the occipital region and upper trapezius;" and  limited range of motion of the cervical spine.  Id.  The range of motion was limited with respect to extension, flexion and lateral bending of the neck.  Rotation of the neck was normal. Id.  It was further noted that McKnight had "full functional motion at the shoulder complexes" and that "[c]ervical motion was limited by tightness, not increased pain complaints." Id. Ms. Farrer's assessment was that McKnight "presents with a physician diagnosis of [status post anterior cervical discectomy] and fusion, with clinical findings consistent with such.  He will benefit from skilled [physical therapy] intervention to address soft tissue dysfunction, decreased [range of motion], strength, and decreased functional ability." Id. Ms. Farrer's plan was to schedule McKnight for physical therapy 3 times a week for 6 weeks. Id.

McKnight had physical therapy sessions with Ms. Farrer on October 11, 13, 17, 18, 23, 2006. Tr. 307-309.  The notes of these appointments reveal that McKnight could "move his neck much easier."  Id. However, McKnight did continue to have pain, soreness, stiffness and developed a problem with his lower back and extremities. Id.

On October 24, 2006, McKnight had a chiropractic session with Dr. Woodworth. Tr. 351. Although Dr. Woodworth made notations about the treatment provided

it is not clear she made any notations regarding objective physical examination findings.[49]

Id.

McKnight had physical therapy sessions with Ms. Farrer on October 25 and 27, 2006.  Tr. 309.  The notes of these appointments reveal that McKnight had cervical pain, spasms in the upper trapezius and limitation of motion. Id.

On October 27, 2006, Ms. Farrer reviewed McKnight's progress in a letter  to Dr. Tuffaha. Tr. 310. That letter states in pertinent part as follows:

> [McKnight] is reporting average pain at 7 to 8/10. He reports that heat is the only thing that helps to dissipate his symptoms.  He is reporting pain in the cervical paraspinals extending out over the upper trapezius and pain in the front of his [left] chest.  He is reporting that he feels more flexible since starting [physical therapy], however his pain levels have increased.  At this time, he is only doing light flexibility for cervical paraspinals and anterior chest. He is only performing minimal exercise and reports that any advancements in exercise exacerbates his pain complaint.  He has generalized tightness and tenderness, however no localized tenderness.  In supine he is able to achieve 80° cervical rotation bilaterally[50] without increased pain complaint.

Id.

McKnight had a physical therapy session with Ms. Farrer on October 30, 2006. Tr. 311.  McKnight's pain level at this appointment was 7 on a scale of 1 to 10.  Id.

On October 31, 2006, McKnight starting treatment with Becky Hinman, a licensed acupuncturist, in Elmira, New York. Tr. 386.

On November 8, 2006, McKnight had an appointment with Dr. Tuffaha. Tr. 335. At that appointment McKnight complained of cervical pain when performing certain physical

---

[49]There is a brief notation at the top of the form relating to this appointment. However, we are unable to decipher that notation.

[50]Normal range of cervical rotation is 60 to 80 degrees.

therapy exercises. Id.  Dr. Tuffaha's physical examination of McKnight neck revealed "fairly good range motion in all directions" and examination of the low back revealed a pulling discomfort with straight leg raising to 90 degrees.  Id. A motor examination was satisfactory. Id. Dr. Tuffaha's impression was that McKnight had a "[r]ecent exacerbation of posterior inferior cervical pain, probably myoligamentous, along with left lateral leg pain, suggestive of L5 radiculitis." Id. Dr. Tuffaha ordered cervical spine x-rays and directed that he continue with the same medications and the acupuncture treatments. Id.  An x-ray of the cervical spine on November 8th revealed "changes related to the previous anterior fusion . . . similar to prior x-rays of 9/27/2006 [and] satisfactory alignment of the cervical spine in various positions. Degenerative spondylotic changes . . . in the mid and lower cervical spine, most notable at C6-C7 and to a slightly lesser degree, at C5-C6 levels. No fracture of the cervical spine[.]" Tr. 328.

McKnight had appointments with Ms Hinman, the acupuncturist, on November 7, 14, and 21, December 5, 19 and 20, 2006, and January 2 and 9, 2007. Tr. 387-390. Ms. Hinman's notes of these appointments are handwritten and hard to decipher.  However, they do reveal that McKnight continued to complain of musculoskeletal pain, including neck pain. Id. [51]

On January 10, 2007, McKnight had an appointment with Dr. Tuffaha. Tr. 334. At that appointment McKnight "described overall generalized improvement with

---

[51]The record reveals that McKnight had appointments with the acupuncturist on January 15, 23 and 30, February 13 and 27, March 13 and 27, May 1, June 5, July 17, August 14 and 28, and September 25, 2007. Tr. 390-395.   These treatment notes indicate that McKnight continued to complain of musculoskeletal problems, including neck pain and spasms.

acupuncture." Id.   McKnight stated he tried exercises at home but he could not tolerate them because of increased pain.  He also stated that he had left arm numbness and neck pain while reading a magazine. Id.   Dr. Tuffaha's physical examination of McKnight's neck revealed "mild limitation of range of motion in all directions, especially on flexion[.]" Id.  It was noted that examination of McKnight's low back revealed "mild limitation of range of motion at the waist on extension and fairly good range of motion in all other directions." Id.   Straight leg raising test were negative.  Id.  Furthermore, neurologically McKnight was stable and his gait was satisfactory. Id.  Dr. Tuffaha ordered x-rays of the cervical spine, directed McKnight to proceed with physical therapy and prescribed the drug Relafen.[52] Id.

On February 23, 2007, McKnight was evaluated by William R. Prebola, M.D., who is board certified in physical medicine and rehabilitation. Tr. 446-453.  Dr. Prebola in his report stated that McKnight "currently is involved in acupuncture with Becky Hindman (sic), one time a week, and this has been helpful. He changes position, but he does have good days and bad days, when his pain waxes and wanes. There are some days that he is very incapacitated." Tr. 448.  Dr. Prebola's physical examination of McKnight revealed that McKnight's "[c]ervical range [of motion] had significant limitation at 25-50% full range of motion, consistent with his prior surgery. Lumbar flexion was slow, past 70 degrees with moderate pain." Tr. 450.  On palpation, Dr. Prebola observed "tenderness in the right low lumbar region, but there was no trigger point." Id.  McKnight had "[s]pasm in both cervical paraspinals and significant spasm in the upper trapezius with trigger points." Id.  McKnight

---

[52]Relafen is a nonsteroidal anti-inflammatory drug used to treat pain or inflammation caused by arthritis.  Relafen, Drugs.com, http://www.drugs.com/relafen.html (Last accessed October 19, 2011).

had reduced reflexes and diminished sensory function over the foot and right calf.  Id.  Dr.

Prebola noticed some muscle atrophy in the left forearm.  Tr. 451.  Spurling's test was

positive to the left[53] and Gaenslen's maneuver was positive on the right.[54] Id.  Dr. Prebola's

assessment was that McKnight suffered from "residual left sided radiculopathy and

myofascial spasms" after having the anterior cervical discectomy and fusion.  Id.  He also

concluded that McKnight had "[r]ight leg numbness, most likely related to lumbar

radiculopathy[.]"  Id.   With regard to McKnight's functional abilities Dr. Prebola stated as

follows:

> Based on my examination today, he has reached maximum medical improvement in regards to his neck injury . . . He requires ongoing pain management in regards to that injury.  Continued used of Antivan[55] is certainly reasonable.  He should continue with the acupuncture treatment for the myofascial spasms.  He may consider low dose muscle relaxers for night-time use for the myofascial spasms.  In regards to that injury, he does suffer permanent partial disability. Light duty work with maximum lifting of 15 pounds occasionally and 5 pounds frequently. He cannot perform left arm pushing and pulling activities. He cannot perform repetitive cervical twisting and bending activities.

Tr. 452 (emphasis added).

---

[53]The Spurling's test is an examination to determine whether a patient suffers from cervical spondylosis or radiculopathy.  It is an "evaluation for cervical nerve root impingement in which the patient extends the neck and rotates and laterally bends the head toward the symptomatic side; an axial compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain."  MediLexicon, Definition:'Spurling Test,' http://www.medilexicon.com/medicaldictionary.php?t=90833 (Last accessed October 18, 2011).

[54]The Gaenslen's test or maneuver is an examination to determine whether a patient suffers from abnormalities or inflammation of the lumbar vertebrae and sacroiliac joint.  Dorland's Illustrated Medical Dictionary, 1522 (27th Ed. 1988).

[55]Antivan is a brand name for lorazepam.

On March 7, 2007, McKnight had an appointment with Dr. Meyers regarding his chronic pain symptoms. Tr. 463-464. Dr. Meyers's reported objective physical examination findings are limited and essentially normal. Id. Dr. Meyer's assessment was that McKnight suffered from "considerable right upper extremity symptoms" from his cervical surgery and "right lower extremity numbness and tingling." Id. Dr. Meyers prescribed the drugs Cymbalta[56] and Lorazepam.  Tr. 462 and 486.

On March 12, 2007, McKnight had an MRI of the thoracic spine performed at Soldiers & Sailors Memorial Hospital, Wellsboro. Tr. 488.  The MRI revealed disc dessication and slight loss of disc space height in the mid and lower thoracic spine.  There was no evidence of disc herniation but "mild annular bulging at the T3-4, T11-12 and T12-L1 levels with "no significant foraminal narrowing." Id.

On March 22 and May 15, 2007,  McKnight had chiropractic sessions with Dr. Woodworth. Tr. 522 .  The treatment notes of these sessions are only partially legible.  It appears that McKnight complained of low back pain. Id.

On July 19, 2007, McKnight was again evaluated by Dr. Prebola. Tr. 502-510. Dr. Prebola's physical examination of McKnight revealed findings similar to those found at the evaluation in February, 2007, and his assessment was similar.

On July 24, 2007,  McKnight had chiropractic sessions with Dr. Woodworth. Tr. 522 .  The treatment notes of these sessions are only partially legible.  It appears that McKnight complained of low back pain. Id.

---

[56]Cymbalta is a drug used to treat major depressive disorder and general anxiety disorder. It is also used to treat chronic pain. Cymbalta, Drugs.com,http://www.drugs.com/cymbalta.html (Last accessed October 17, 2011).

On August 8, 2007, McKnight had an appointment with Dr. Meyers regarding his chronic pain. Tr. 461.  The treatment note indicates that McKnight was "working with acupuncture and acupressure on his own[] which [] helped at times" and that "[h]e [was] still having trouble with numbness that [was] intermittent in his right lower extremity[.]"  It was also stated that he had "right calf pain in addition to his cervical symptoms" and they  "had talked about trying some Cymbalta at his last visit. However, after reading the potential side effects, he did not try that medication" and was "attempting to wean himself off his lorazepam." Id.  It was stated that because of conflicting opinions from neurosurgeons McKnight wanted another opinion regarding his condition.  Dr. Meyers referred him to Carson J. Thompson, M.D., in Sayre, Pennsylvania. Tr. 513 and 538.

On August 15, 2007, McKnight had an MRI of the cervical spine performed at Soldiers & Sailors Memorial Hospital, Wellsboro.  Tr. 491. The MRI revealed "C6-7 chronic degenerative disc disease with bilateral (left greater than right) neural foraminal narrowing." Id.  The MRI revealed the evidence of the prior surgery and that "[t]here appear[ed] to be less spinal canal narrowing at this level when compared to the previous exam." Id. [57]

On August 21, 2007, McKnight had a chiropractic session with Dr. Woodworth. Tr. 522 .   The treatment notes of this session are only partially legible.  It appears that McKnight complained of low back pain and radicular pain in the right arm. Id.

On September 4, 2007, McKnight was evaluated by Dr. Thompson, a neurologist. Tr. 513-514.  Dr. Thompson concluded that "his residual symptoms [could] be due to a post fusion syndrome" but that he could "see nothing that [he could] help him with

---

[57]It was stated that the neural foraminal narrowing had not changed significantly but there was "less significant spinal canal narrowing at this level."

surgically at this point." Id.

On September 18, November 13, and December 11, 2007, and January 15, 2008,  McKnight had chiropractic sessions with Dr. Woodworth. Tr. 522-523 . The treatment notes of these sessions are only partially legible.  It appears that McKnight complained of low back pain. Id.

On January 21, 2008, McKnight had an appointment with Dr. Meyers regarding his chronic pain.  Tr. 539.   Dr. Meyers noted a positive straight leg raise test on the right. Dr. Meyers's assessment was that McKnight suffered from "persistent upper extremity numbness after cervical fusion" and "lower extremity numbness." Id. Dr. Meyers prescribed Ultram[58] for pain and ordered an EMG. Id.[59]

On February 5, 2008, Dr. Woodworth, the chiropractor, completed on behalf of McKnight a document entitled "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities." Tr. 347 and 349.   A review of this document reveals that Dr. Woodworth limited McKnight to less than full-time employment.   Dr. Woodworth stated, *inter alia*, that McKnight could stand and walk 1 to 2 hours in an 8-hour workday and sit 2 hours in an 8-hour workday;   McKnight could only occasionally lift or carry 10 pounds; McKnight had difficulty reaching and, could never kneel, stoop, crouch, balance or climb because of neck surgery; and McKnight had limitations with respect to heights, vibration and temperature extremes. Id.

---

[58]"Ultram (tramadol) is a narcotic-like pain reliever. Ultram is used to treat moderate to severe pain." Ultram, Drugs.com, http://www.drugs.com/ultram.html (Last accessed October 18, 2011).

[59]A Nerve Conduction/EMG of the left upper extremity conducted on April 3, 2008, was normal. Tr. 568-569.

On February 12 and March 11, 2008, McKnight had chiropractic sessions with Dr. Woodworth. Tr. 523 .  The treatment notes of these sessions are only partially legible. It appears that McKnight complained of neck and low back pain. Id.

On March 11, 2008, McKnight was evaluated by Wawrzyniec Stepczak, M.D. Tr. 407-412.  Dr. Stepczak's physical examination of McKnight revealed reduced sensation in the right leg, fine tremor in the left arm, toe walking possible but with lower back pain; both patella, achilles, and biceps tendon reflexes reduced; and a positive straight leg raise test on the right side. Id.  Dr. Stepczak's assessment was that McKnight suffered from cervical disc disease, lumbar spondylosis, migraine headaches and alcohol overuse.[60]  Dr. Stepczak completed on behalf of McKnight a document entitled "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities." Tr. 409-410.  A review of this document reveals that Dr. Stepczak limited McKnight to less than full-time employment.  Dr. Stepczak, stated, *inter alia*,  that McKnight could frequently  lift and/or carry 10 pounds; McKnight could stand and/or walk 1 hour or less in an 8-hour workday and sit less than 1 hour in an 8-hour workday;  McKnight could frequently balance but only occasionally bend, kneel, stoop, crouch and climb; and McKnight had limitations with respect to pushing and pulling with the upper and lower extremities. Id.   Dr. Stepczak also completed a range of motion chart which reveals that McKnight had limited range of motion in the cervical and lumbar spines. Tr. 412.

On March 13, 2008, Leo P. Potera, M.D., a non-treating and non-examining state agency physician completed a document entitled "Physical Residual Functional

---

[60]McKnight told Dr. Stepczak that he drank 4 to 5 beers daily to alleviate his low back pain. Tr. 407.

Capacity Assessment. Tr. 418-424.   A review of that document reveals that Dr. Potera concluded that McKnight could engage in a limited range of full-time light work. Dr. Potera stated that McKnight had limitations using his upper and lower extremities but did not specify the degree or nature of the limitations. Id.   He also stated that McKnight should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery and heights. Id. In finding that McKnight could engage in full-time work, there is no indication that Dr. Potera considered the opinion and treatment notes of Dr. Woodworth. Also, there is no indication he considered the physical therapy records or the opinion of Dr. Prebola.

On April 8, 2008,  McKnight had a chiropractic session with Dr. Woodworth. Tr. 524 .  The treatment note of this session is only partially legible.  It appears that McKnight complained of neck and low back pain. Id.

On May 8, 2008, McKnight had an appointment with Daniel E. Britton, M.D., in Wellsboro. Tr. 547-548.   Dr. Britton's physical examination of McKnight revealed the following: "He has definite tenderness over the trapezius muscle on the left that is significant and represents a trigger point in that muscle.  He does not have any other trigger points specifically, possibly in the upper sternocleidomastoid muscle there are some trigger points, but none in the serratus anterior or pectoralis area.  He does get pain in the pectoralis region at times that sounds like it may be in C7 distribution." Id.   Dr. Britton's assessment was that McKnight suffered from myofascial pain and that "[h]e will have good days and feel like he can do something and overdo it and pay for it the next two days with increased pain, stiffness and swelling in the muscles in the neck and shoulder." Id.  Dr. Britton further stated that "[t]his is very typical of myofascial pain" and "it is a very difficult type of pain to treat because

of the variables that affect the muscle in terms of muscle tone and tightness." Id.  Dr. Britton concluded that "I think there are some things that he can do, but they are difficult and at the present time he remains disabled for any work." Id.

On May 17 and June 16,  2008,  McKnight had chiropractic sessions with Dr. Woodworth. Tr. 524 .  The treatment notes of these sessions are only partially legible.  It appears that McKnight complained of neck and low back pain. Id.

On July 15, August 12, September 9, October 7, November 4, and December 9, 2008, McKnight had chiropractic sessions with Dr. Woodworth. Tr. 524-525 .  The treatment notes of these sessions are only partially legible.  It appears that McKnight complained of neck and low back pain. Id.

The December 9, 2008, appointment was the last medical appointment prior to McKnight's date last insured.

## DISCUSSION

The administrative record in this case is 616 pages in length and we have thoroughly reviewed that record.  McKnight  argues that the administrative law judge erred when he failed to appropriately consider the opinions of treating medical providers.  That arguments has merit.  In addition, the administrative law judge erred (1)  at step  two of the sequential evaluation process when he failed to consider all of McKnight's medically determinable impairments, (2) at step three when he failed to give an adequate explanation for why McKnight's impairments did not meet a listing, (3) at step four when determining McKnight's residual functional capacity, and (4) at step five when he relied solely on the Medical-Vocational Guidelines in concluding there were other jobs that McKnight could perform.

54

The administrative law judge at step one of the sequential evaluation process found that McKnight  had not engaged in substantial gainful work activity since October 17, 2003, the alleged disability onset date. Tr. 14.

Step two of the sequential evaluation process, is the first point at which the administrative law judge committed legal and factual error.  At step two, the administrative law judge found that McKnight suffers from the following severe impairments: chronic neck pain with radiation to the chest and the left upper extremity and chronic lower back pain with radiation to the right lower extremity. Tr. 14.   The Social Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments and then when setting a claimant's residual functional capacity considering the symptoms of both medically determinable severe and non-severe impairments.  20 C.F.R. § 404.1529.  Pain is more appropriately considered a symptom of a medical impairment. Davis v. Astrue, Civil No. 10-805, slip op. at 11-12 (M.D. Pa. February 15, 2011)(Muir, J.); Social Security Ruling 96-3p; Social Security Ruling 96-7p; HALLEX[61] II-4-1-3 ("[P]ain is a symptom of an impairment and not an impairment itself").   Medically determinable impairments, for example, would be a herniated cervical disc, cervical or lumbar radiculopathy, degenerative disc disease,  spinal and foraminal stenosis, gastroesophageal reflux disease, high blood pressure, obesity and major depressive disorder. The administrative law judge mentions several conditions in reviewing the medical records but does not specify what caused McKnight's chronic neck pain with radiation to the left upper extremity and chronic low back pain with radiation to left lower extremity.

---

[61] HALLEX is the Social Security Administration's Hearing, Appeals and Litigation Law Manual.

The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520©.   If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.   If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two.  However, all of the medically determinable impairments both severe and non-severe must be considered at step four when setting the residual functional capacity.  The social security regulations mandate such consideration and this court has repeatedly so indicated. See, e.g., Christenson v. Astrue, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.); 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

The record suggests that McKnight suffered from degenerative disc disease and foraminal stenosis of the cervical spine with radiculopathy , degenerative disc disease of the thoracic spine  and degenerative disc disease of the lumbar spine with radiculopathy.  The failure of the administrative law judge to find the above noted conditions as medically determinable impairments, or to give an adequate explanation for discounting them, makes his decisions at steps two and four of the sequential evaluation process defective.

The error at step two of the sequential evaluation process draws into question the administrative law judge's residual functional capacity determination and assessment of the credibility of McKnight.  The administrative law judge found that McKnight's medically determinable impairments could reasonably cause McKnight's alleged symptoms but that

McKnight's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible.  This determination by the administrative law judge was based on an incomplete and faulty analysis of all of McKnight's medically determinable impairments.

At step three of the sequential evaluation process the administrative law judge found that McKnight did not have an impairment or combination of impairments that met or equaled a listed impairment. Tr. 15.  The administrative law judge's step three analysis was in toto as follows:

> The claimant did not allege that his condition satisfies the requirements of any of the listed impairments. However, in light of the claimant's neck and back pain, section 1.04 of the listed impairments, which sets forth the requirements for satisfying the listing of disorders of the spine was considered.  However, the claimant's neck and back conditions while "severe," do not meet the requirements of this listing because there is no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis.  As such, the claimant's these (sic) impairments do not rise to the level of severity necessary to satisfy the listing.

Tr. 15.   Listing 1.04 states as follows:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine):
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

57

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in the inability to ambulate effectively, as defined in 1.00B2b.

McKnight argues that he meets Listing 1.04A.   The medical records suggest that McKnight suffered a herniated disc in the cervical spine and degenerative disc disease.   There is evidence that he suffered compromise of a nerve root and the spinal cord, neuro-anatomic distribution of pain, limitation of motion, muscle weakness and sensory and reflex loss. The administrative law judge failed to give an adequate explanation for finding that McKnight did not meet Listing 1.04A.   The explanation given by the administrative law judge is too conclusory.

At step four, the administrative law judge found that McKnight could not perform his prior relevant work as an automobile mechanic but that he had the residual functional capacity to perform a limited range of light  work.  Specifically, the administrative law judge found that McKnight

had the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit for 6 hours in an 8 hour workday, stand and/or walk for 6 hours in an 8 hour workday. He retained the ability to occasionally[62] push and/or pull with his left arm, frequently[63] push and/or pull with his right arm, and occasionally engage in postural activities.

Tr. 15.    The administrative law judge's residual functional capacity determination is not supported by substantial evidence.    He fails to adequately explain why he rejected the

---

[62]"Occasionally" is defined as up to 1/3 of an 8-hour workday.

[63]"Frequently" is defined as up to 2/3 of an 8-hour workday.

58

assessments of treating physicians and physical therapists.  Treating physicians limited McKnight to less than full-time sedentary work and a physical therapist consistently noted that McKnight had limited use of his upper extremities.  Also, the state agency physician, Dr. Potera, noted that McKnight had limited use of his upper and lower extremities, and specified environmental restrictions, i.e., McKnight should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery and heights.  The administrative law judge did not adequately address these limitations when setting McKnight's residual functional capacity.

The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits.  See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason."  Id.  In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence.  Id.  An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion.  Id.  An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility."  Id.  As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena

are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).   In this case the administrative law judge relied exclusively on his lay analysis of the medical records and the opinion of Dr. Potera,  the state agency physician.  Although as noted the administrative law judge ignored part of Dr. Potera's opinion.

As reviewed earlier in this memorandum at least two physicians who actually examined or treated McKnight – Dr. Woodward and Dr. Stepczak  - limited McKnight to less than the functional requirements of full-time sedentary work.  The administrative law judge rejected the opinions of those medical providers.  Also, Dr. Prebola concluded that McKnight should refrain from pushing and pulling activities with his left arm and is unable to perform repetitive cervical twisting and bending.  The administrative law judge rejected that opinion. In light of the medical evidence that we reviewed in this memorandum, the administrative law judge failed to give an adequate reason for rejecting the opinions of Dr. Woodward, Prebola, and Stepczak.

In rejecting Dr. Prebola's opinion, the administrative law judge committed an error by stating that Dr. Prebola relied on diagnostic images that were taken prior to the claimant's cervical spine surgery. It is clear from our review of the medical records that Dr. Prebola was aware of the spinal surgery performed by Dr. Tuffaha and that his assessment was based on his physical examination of McKnight.[64]   Dr. Prebola concluded that McKnight could not push or pull with his upper or lower extremities.  The administrative law judge did not factor that limitation into his residual functional capacity assessment.

---

[64]Furthermore, a subsequent MRI of McKnight's cervical spine dated August 15, 2007,  revealed that McKnight still suffered from "C6-7 chronic degenerative disc disease with bilateral (left greater than right) neural foraminal narrowing." Tr. 491.

In rejecting Dr. Stepczak's opinion the administrative law judge stated that Dr. Stepczak did not provide supportive clinical findings in his report and his opinion is not supported by objective medical evidence of record.  First, Dr. Stepczak did make objective physical examination findings and the administrative law judge is not competent to say that those findings do not support Dr. Stepczak's functional assessment.[65]

In rejecting Dr. Woodward's functional assessment of McKnight, the administrative law judge stated that a chiropractor is not an acceptable medical source as defined by the Social Security regulations.  Tr. 18.  Although Dr. Woodward was not an acceptable medical source to provide a diagnosis of a medically determinable impairment or condition, she was an appropriate "other source" to "show the severity of [McKnight's] impairment(s) and how [the impairments] affect[ed] [his] ability to work."  20 C.F.R. § 404.1513(d).[66]  The administrative law judge further stated in a conclusory fashion that Dr. Woodward's assessment was not supported by objective medical evidence and inconsistent

---

[65]Although Dr. Potera stated that Dr. Stepczak's opinion was "an overestimate of the severity of [McKnight's] functional restrictions" Dr. Potera never treated or  examined McKnight and does not explain why it is an "overestimate." Tr. 424.  Also, Dr. Potera mentions that his opinion is different from that of  Dr. Stepczak because of "inconsistencies with the totality of the evidence in file" but Dr. Potera does not elaborate on or specify the inconsistencies. Dr. Potera does not specify how Dr. Stepczak's opinion is not supported by objective medical evidence.

[66]Section 404.1513(d) states in relevant part as follows:

(d) Other sources. In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to –

(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physician's assistants, naturopaths, chiropractors, audiologists, and therapists); . . . .

with the opinions of acceptable medical sources.  The administrative law judge also stated that Dr. Woodworth's assessment was inconsistent with Dr. Woodworth's conclusion that McKnight could return to work or begin vocational training. Tr. 18. However, we do not see an inconsistency because Dr. Woodworth did not state that McKnight could return to full-time employment.

The administrative law judge also stated that the "[p]hysical therapy records from 2004 show that claimant's symptoms greatly improved with therapy." Tr. 17.  It appears that the administrative law judge ignored Ms. Fabian's letter of August17, 2004, in which she stated "[t]he patient has progressed in physical therapy to a point where 75% of the time he is pain free if he is doing nothing . . . The patient continues to have symptoms of spasms and sever[e] pain if he uses his arms above his head." Tr. 270 (emphasis added).  The physical therapy records reveal that McKnight's pain waxed and waned.  McKnight had good days and bad days and continued to have limited use of his upper extremities.

At step five of the sequential evaluation process the administrative law judge utilizing the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, found that McKnight was not disabled.[67]

Contained within the Social Security regulations are grids or tables which list Rules 201.01 through 201.29 and 202.01 through 202.22 in the left hand column.  These grids or tables are found at 20 C.F.R., Pt. 404, Subpt. P, App. 2.  The Social Security regulations provide that "where the findings of fact made with respect to a particular

---

[67]At step five the Commissioner has the burden to show that an individual applying for benefits is capable of performing other jobs existing in significant numbers in the national economy, considering the applicant's age, education, work experience, and residual functional capacity.  Ramirez v. Barnhart, 373 F3d 546, 551 (3d Cir. 2004).

individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." Rule 200.00.   In the right hand column of the grid or table is set forth the "Decision" as to whether a claimant is "disabled" or "not disabled."   If all of the criteria of a particular Rule are met "[t]he existence of jobs in the national economy is reflected in the 'Decisions' shown in the rules, i.e., in promulgating the rules, administrative notice has been taken of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels. . . Thus, when all factors coincide with the criteria of a rule, the existence of such jobs is established." Rule 200.00(b).   Furthermore, section 200.00(e) of the Medical-Vocational Guidelines states:

> (e) Since the rules are predicated on an individual's having an impairment which manifests itself by limitations in meeting the strength requirements of jobs, they may not be fully applicable where the nature of an individual's impairment does not result in such limitations, e.g., certain mental, sensory, or skin impairments. In addition, some impairments may result solely in postural and manipulative limitations or environmental restrictions. Environmental restrictions are those restrictions which result in inability to tolerate some physical feature(s) of work settings that occur in certain industries or types of work, e.g., an inability to tolerate dust or fumes.

Appendix 2 to Subpart P of Part 404 – Medical Vocational Guidelines.

When certain limitations (e.g., postural and environmental)  may impact the number of occupations available in a particular exertional category, Social Security Ruling 83-12 gives further guidance.  That Ruling states in pertinent part as follows:

> Each numbered [Vocational] rule directs a conclusion as to whether an individual in a specific case situation is able to make an adjustment to work other than that previously performed. The decision is based on the remaining occupational base, as determined by [Residual Functional

Capacity], in conjunction with his or her age, education, and work experience. . . .

Where an individual exertional RFC does not coincide with the definitions of any one of the ranges of work . . . the occupational base is affected and may or may not represent a significant number of jobs in terms of the rules directing a conclusion as to disability.  The adjudicator will consider the extent of any erosion of the occupational base and access its significance.  In some instances, the restriction will be so slight that it would clearly have little effect on the occupational base. In cases of considerably greater restriction(s), the occupational base will obviously be affected.  In still other instances, the restrictions of the occupational base will be less obvious.

Where the extent of erosion of the occupational base is not clear, the adjudicator will need to consult a vocational resource.  The publications listed in sections 404.1566 and 416.966 of the regulations will be sufficient for relatively simple issues.  In more complex cases, a person or persons with specialized knowledge would be helpful.

SSR 83-12.

The administrative law judge found that although McKnight could not perform the full range of light work, McKnight could perform the full-range of sedentary work. Tr. 19.  The administrative law judge further stated that because the additional limitation of only occasional pushing and pulling with his left arm had little or no effect on the occupational base of unskilled light work a finding of "not disabled" is appropriate under the framework of Medical-Vocational Rule 202.21 and Social Security Ruling 83-12." Id.  It was error for the administrative law judge to use the Medical-Vocational Guidelines because McKnight had

postural limitations, limited use of his upper extremities and environmental limitations.[68]
Poulos, 474 F.3d at 93-94; Sykes v. Apfel, 228 F.3d 259, 261 (3d Cir. 2000).

Under certain circumstances  the Medical-Vocational Guidelines can be utilized when additional limitations exist.   Those instances are where a vocational source is consulted or a vocational expert testifies and the vocational source or expert indicates that the additional limitations would not impact the occupational base.  The administrative law judge indicated that "the additional limitation of only occasional pushing and pulling" would have "little or no effect on the occupational base" but in so finding the administrative law judge did not cite a vocational source or call a vocational expert to so testify.  Furthermore, the administrative law judge did not consider the other limitations, i.e., postural and environmental.

Also, the administrative law judge in evaluating McKnight's credibility did not consider his lengthy work history.  As noted earlier in this order, McKnight has a 26-year work history.  "When a claimant has worked for a long period of time, [his] testimony about [his] work capabilities should be accorded substantial credibility."   Rieder v. Apfel, 115 F.Supp.2d 496, 505 (M.D.Pa. 2000)(Munley, J.)(citing Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979)).  The administrative law judge did not give an adequate reason for discrediting McKnight's testimony.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  We will, therefore, pursuant to 42

---

[68]The administrative law judge did not give an adequate explanation for discounting those limitations.

U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

An appropriate order will be entered.


s/A.Richard Caputo
A. RICHARD CAPUTO
United States District Judge


Dated: October 20, 2011

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

STEPHEN W. MCKNIGHT,     :

          :

     Plaintiff     :    **CIVIL ACTION NO. 4:10-CV-02126**

          :

     vs.     :    **(Complaint Filed 10/14/10)**

          :

MICHAEL ASTRUE,     :

COMMISSIONER OF SOCIAL     :    **(Judge Caputo)**

SOCIAL SECURITY,     :

          :

     Defendant     :

## ORDER

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

1.  The Clerk of Court shall enter judgment in favor of Stephen W. McKnight and against Michael J. Astrue, Commissioner of Social Security, as set forth in the following paragraph.

2.  The decision of the Commissioner of Social Security denying Stephen W. McKnight disability insurance benefits is vacated and the case remanded to the Commissioner of Social Security to:

2.1 Conduct a new administrative hearing and appropriately evaluate the medical and vocational evidence and the credibility of Stephen W. McKnight.

3.  The Clerk of Court shall close this case.

s/A.Richard Caputo
A. RICHARD CAPUTO
United States District Judge

Dated: October 20, 2011